[NOT FOR PUBLICATION]                         [DOCKET NO. 39]

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

RICK RUSSO,                    :
                               :
          Plaintiff,           :      HONORABLE RENÉE MARIE BUMB
                               :         CIVIL ACTION NO. 13-3911
     v.                        :
                               :             **OPINION**
CITY OF ATLANTIC CITY,         :
and ANTHONY COX,               :
                               :
          Defendants.          :
_____:


**APPEARANCES**:

CASTELLANI LAW FIRM, LLC
By:  David R. Castellani, Esq.
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
          Counsel for Plaintiff

LAW OFFICES OF RILEY & RILEY
By:  Tracy L. Riley, Esq.
The Washington House
100 High Street, Suite 302
Mount Holly, New Jersey 08060
          Counsel for Defendant Cox

LAW OFFICE OF MICHAEL A ARMSTRONG
By:  Barbara Ann Johnson-Stokes, Esq.
79 Mainbridge Lane
Willingboro, New Jersey 08046
          Counsel for Defendant City of Atlantic City


**BUMB**, United States District Judge:


     Plaintiff Rick Russo brings this employment retaliation

suit against his employer, Defendant City of Atlantic City and

                              1

one of his supervisors, Defendant Anthony Cox.  The Complaint
asserts two counts: (1) violation of Russo's First Amendment
rights (via 42 U.S.C. § 1983), and (2) violation of New Jersey's
Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1
et seq.  Defendants move for summary judgment.

    For the reasons stated herein, the motion will be granted
as to all federal claims, and the parties will be ordered to
show cause why the Court should not dismiss without prejudice
the CEPA claims pursuant to 28 U.S.C. § 1367(c)(3) ("The
district courts may decline to exercise supplemental
jurisdiction over a claim . . . if . . . the district court has
dismissed all claims over which it has original jurisdiction.").


**I.  Facts**

    Plaintiff Russo has been employed by Defendant Atlantic
City in its Licensing and Inspection Department since 1994.
(Russo Dep. p. 57)  The events leading up to this lawsuit began
in 2011.  Russo was Supervising Field Representative at the
time, which is a civil service position.  He reported to Garry
Alston who was Chief Field Representative.  Alston reported to
Defendant Cox who was Director of Licensing and Inspections.

    In November of 2011, Cox "wrote-up" Russo for failing to
report to his superiors, including Defendant Cox, that a
Saturday overtime non-emergency inspection scheduled was not

performed by an inspector whom Russo supervised. (Russo Dep. p. 57; Defs' Ex. E)  Despite this being Russo's very first Notice of Disciplinary Action ever (Id. at p. 191; Defs' Ex. E), Defendant Cox recommended "major" disciplinary action, which is a suspension of six or more days. (Cox Dep. p. 175, 178) Significantly, however, Russo did not learn of the proposed disciplinary action until many months later, on April 16, 2012, when he was served with the notice. (Russo Dep. p. 163)

In the interim between the drafting of the notice and its service upon Russo, an incident involving the property at 1600 Arctic Avenue occurred.  An inspector whom Russo supervised, John Stinsman, issued a "Notice of Violation and Order to Abate" to the owner of the property, which was identified as "1600 Arctic Avenue LLC." (Defs' Ex. P)  The building was undisputedly vacant and partially boarded-up (Cox Dep. 156, 166-70), and in accordance with regular procedures (Russo Dep. p. 137, 139), the notice ordered that the property be "repair[ed] or demolish[ed]." (Defs' Ex. P)

Russo testified that he approved the notice by using Garry Alston's signature stamp because Alston was out on medical leave at the time. (Russo Dep. p. 138-43)[1]

---

[1]  It is undisputed that Russo was temporarily serving "out-of-title" as Chief Field Representative while Alston was on medical leave.  Russo testified that he did not have Alston's authorization to use the stamp, but used it because he believed

As it turned out, one of the members of 1600 Arctic Avenue LLC was Defendant Cox.  Russo testified that he had no reason to know this-- and in fact did not know it-- when he stamped the notice. (Russo Dep. p. 144)

Cox testified that soon after the notice was issued, his business partner forwarded it to him. (Cox Dep. p. 126-27, 132, 155, 167)  Cox, recognizing the conflict of interest raised by his department inspecting a property in which he had an ownership interest, "immediately" forwarded the notice to the City's Business Administrator. (Cox Dep. p. 127, 133, 155, 160) Shortly thereafter, the Business Administrator, "just as [he had] done in other cases," began the process of voiding Stinsman's inspection and assigning the inspection to another municipality. (Defs' Ex. R; Cox Dep. p. 160)  Russo learned of Defendant Cox's ownership interest in 1600 Artic Avenue when the Business Administrator circulated a memo advising of the conflict. (Russo Dep. p. 144)

Notably, Cox testified that he did not know that Russo "had a decision on" the Arctic Avenue notice (Cox Dep. p. 122), and the notice undisputedly does not bear Russo's name because Russo used Alston's signature stamp.  Cox further testified that he was unaware that Alston was out on medical leave at the time the

---

"the only one who could sign [the notice] is Garry Alston, so in lieu of him not being there, . . . [the clerical staff and I] used the stamp." (Russo Dep. p. 138-39)

notice was issued, and was unaware that Russo was filling-in. (Cox Dep. p. 127, 132, 167)  When asked at his deposition, "[y]ou're the director of the department [of Licensing and Inspections] and you did not know that your chief of code enforcement was on leave of absence at the time?," Cox answered, "[w]hat I did know was that I had four or five other divisions that I'm responsible for and that a document shows up with Garry [Alston's] name stamped and an inspector.  That's what I knew. That's all I knew."  (Cox Dep. p. 128)

The Business Administrator's internal memorandum advising Alston of the conflict concerning 1600 Arctic Avenue is dated March 30, 2012.  (Defs' Ex. R)  Approximately two weeks later, on April 16, 2012, Russo was served with the Notice of Disciplinary Action discussed above.

In July, 2012, Russo's disciplinary hearing on the notice was held. (Defs' Ex. E)  On August 20, 2012, the Hearing Officer issued her decision which found that Russo did indeed fail to notify his supervisors of the non-inspection (a fact which Russo has never disputed), and concluded that Russo was "guilty of conduct unbecoming a public employee." (Id.)  But rather than imposing major discipline, the Hearing Officer imposed a one-day suspension. (Id.)

Also in August, 2012, Russo asserts that he had a disagreement with Defendant Cox over an issue with a property

5

located at 117 South Martin Luther King Boulevard ("the MLK

property").  An inspector under Russo's supervision had

previously cited the property for insufficient electrical

service. (Russo Dep. p. 106-09, 117)  Russo explained, "[e]very

dwelling unit is required to have a 60 amp service, a minimal 60

amp service per unit, as per the International Property

Maintenance Code, Chapter 601. . . . Upon inspection of the

building, it was determined that the units only had a 40 amp

service to each unit, so the inspector cited the owner to

upgrade all units to a 60 amp service." (Id. at p. 108)  Russo

further explained that "it's a very big violation . . . because

[fixing the problem requires] such a massive upgrade to the [52-

unit high rise] building," which was built in 1929. (Id. p. 110,

120)

In August, 2012, the owner of the property "petitioned

[Defendant] Cox to have a meeting to apply for an exemption so

he wouldn't be required to upgrade the electric." (Russo Dep. p.

119)  The meeting was held on August 2, 2012. (Defs' Ex. H, J,

N)  Russo attended. (Russo Dep. p. 120)  The property owner made

a "presentation" and submitted documentation showing that the

units were only drawing 27 amps per hour, therefore, he

asserted, the 40 amp service was sufficient. (Id. at p. 120-21;

see also Cox Dep. p. 212)

Defendant Cox granted the exemption at the meeting. (Russo Dep. p. 123) According to Russo, "Cox did not ask [Russo] or [the inspector who issued the citations] to speak on the matter. He just said granted and that was the end of it." (Id. at p. 123)

Russo, concerned that the exemption was not consistent with the International Property Maintenance Code-- the very code which the Licensing and Inspection Department undisputedly has sole jurisdiction to enforce (Russo Dep. p. 98, 132-33; Cox Dep. p. 214-15, 229, 134; Defs' Ex. K, O)[2]-- wrote a memo to Alston, who had not attended the meeting. (Russo Dep. p. 123) Critically, Russo testified,

> A:   I wrote a memo to Garry Alston questioning the exemption that was granted and the manner in which it was granted.  The International Property Code has an administrative chapter that explicitly details the steps needed to grant an exemption and none of the steps were taken in the granting of this exemption, including the recording of the decision.

---

[2]   Plaintiff's brief asserts that the International [Property Maintenance] Code Council is "an outside regulatory authority." (Pl's Opposition Brief p. 2, 6, 7, 31, 32, 36)  The record facts do not support such a characterization insofar as it suggests that the Council had regulatory or enforcement authority over Atlantic City's Licensing and Inspection Department.  The Council's own letter explicitly states, "[c]ode opinions issued by ICC staff are based on ICC-published codes and do not include local, state or federal codes, policies or amendments. . . . As this opinion is only advisory, the final decision is the responsibility of the designated authority charged with the administration and enforcement of this code." (Defs' Ex. G)  The record evidence suggests that the International Code Council promulgates model statutes and regulations that various governmental authorities have adopted. (Cox Dep. p. 214-20)

Q:  Now did Mr. Alston respond to your memo?

A:  I believe he did.

Q:  How did he do that?

A:  He asked me to investigate it.

.  .  .

Q:  And when did he ask you to investigate it?

A:  Shortly after he received my memo.

Q:  .  .  . [W]hat steps did he expect you or want you to take to investigate it?

A:  Well, he thought it might be a good idea to contact the International Property Maintenance Council, of which I am a member of the committee . . . . . I'm the contact for the City for the International Property Maintenance Code. . . . [S]o I sent a letter to . . . the International Property Maintenance Code Council . . . and asked [] a hypothetical situation that was relevant to the [MLK property], whether or not an exemption should be granted based upon the information that I had gathered in reference to that meeting.

        .  .  .

        Q:  And is it your testimony that the sole purpose that you contacted this company was to find out whether or not an exemption should be given?

        A:  Yes.

(Russo Dep. p. 124-26)

On September 12, 2012, the Council responded in writing to Russo. (Defs' Ex. G)  Notably, the letter was addressed to "Mr. Rick Russo, Supervising Field Representative Property Improvement, City of Atlantic City – Code Enforcement

8

Department," and mailed to Russo at his work address.  (Id.)
The letter opined that an exemption should not be granted for "a
10 story 50 unit multi-family building built in 1929 [that] was
cited for not having an electrical service rating of not less
than 60 amperes." (Id.)

On September 27, 2012, Russo forwarded the Council's letter
to Alston. (Defs' Ex. I)  Russo sent the letter with a cover
memo, drafted on "City of Atlantic City, Division of Code
Enforcement" letterhead, entitled "117 So. MLK decision from
Director to grant appeal on electrical violation 2009 IPMC
section 604.2." (Id.)

The same day, Alston forwarded Russo's memo and the
Council's letter to Defendant Cox. (Defs' Ex. J)  It is
undisputed that Cox did not change his decision.  Cox testified
that, in his opinion, the IPMC did not apply. (Cox Dep. p. 214)

In November, 2012, Alston announced his retirement
effective at the end of the month, and recommended to Defendant
Cox that Russo be promoted to the position Alston was vacating--
Chief Field Representative, Property Improvement. (Defs' Ex. S,
T; Cox Dep. p. 79-80, 86)

Effective immediately upon Alston's retirement, Russo began
performing Alston's duties as Acting Chief Field Representative
just as he had done when Alston was previously out on medical

leave. (Russo Dep. p. 118)  Further, Russo admits that Defendant Cox promoted him to Acting Chief. (Id.)

This time, however, Russo contends that the situation was different because Russo was filling a vacancy, rather than a temporary leave of absence.  Russo contends that he should have been appointed provisionally to Alston's spot-- with a corresponding increase in pay-- rather than continuing to serve "out-of-title" in an "acting" capacity, with less pay. (Russo Dep. p. 183-84; Cox Dep. p. 68, 73)  On January 29, 2013, Russo submitted a grievance concerning Defendant Cox's failure to provisionally appoint him to Alston's position. (Pl's Ex. C)  Shortly thereafter, he also filed a "desk audit" with the state civil service commission[3] concerning the same issue. (Russo Dep. p. 226; Cox Dep. p. 253-54)

In March, 2013, Defendant Cox decided to remove Russo as Acting Chief (effectively returning Russo to the position he occupied prior to Alston's retirement-- Supervising Field Representative), and posted a formal vacancy announcement for Alston's position. (Russo Dep. p. 184; Defs' Ex. V)

---

[3] "Under N.J.A.C. 4A:3-3.9(a), an employee who believes that his or her 'duties . . . do not conform to the approved job specification for the title assigned to that position' may request a review of his or her job classification.  This review is commonly referred to as a 'desk audit.'" *In re Camuso*, 2015 N.J. Super. Unpub. LEXIS 106, *2 n.2 (App. Div. Jan. 20, 2015).

According to Russo, the manner in which his removal was accomplished was "very disrespectful." (Russo Dep. p. 185)  He explains that he was informed of the decision on a Thursday, when he had a four-day vacation planned to begin the following Monday.  (Id. at p. 222)  Russo planned to empty his desk and move offices when he returned from vacation. (Id. at p. 223)  But upon his return, he discovered that a move was already underway.  Specifically, Russo testified, someone had "go[ne] into my locked office, empt[ied] out my drawers that were all locked, dump[ed] all of my personal stuff . . . in a big pile so that when I came back, I was basically humiliated, because all the other inspectors saw that and they thought geez." (Id. at p. 224)  Russo's phone allowance was also taken away. (Id. at p. 185-87)

Shortly thereafter, Russo submitted another grievance over his removal from the Acting Chief position. (Pl's Ex. C)

Russo responded to the vacancy announcement and formally applied for the permanent position of Chief Field Representative. (Defs' Ex. X, Y)  Four people, including Russo, applied. (Cox Dep. p. 110)  Russo was not selected.  Instead, Defendant Cox chose Kathleen Dierwechter, who was tied, along with Russo, for the number-one ranking on the civil service list. (Russo Dep. p. 248)  Russo contends that Dierwechter was

11

less qualified for the position because she had no supervisory
experience, whereas Russo did. (Russo Dep. p. 254-55)

## II.  Legal Standard

    "[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'"  *Celotex Corp.
v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.
56(c)).  When deciding whether the moving party is entitled to
summary judgment, the Court must construe the facts and
inferences in a light most favorable to the nonmoving party.
*Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d
Cir. 1986).  The Court's role is not "to weigh the evidence and
determine the truth of the matter, but to determine whether
there is a genuine issue for trial."  *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986).

## III. Analysis

    Russo identifies three instances of alleged protected
speech[4]: (1) his approval of the 1600 Arctic Avenue citation; (2)

---

[4]  The district court "'must conduct a particularized examination
of each activity for which the protection of the First Amendment

12

Russo's request for an opinion from the International Property
Maintenance Code Council in connection with the exemption
Defendant Cox granted to the MLK property; and (3) the
grievances Russo submitted concerning his out-of-title status
(i.e., non-appointment to a provisional position) and removal
from Acting Chief.[5]

The retaliatory acts are asserted to be: (1) being served
with the Notice of Disciplinary Action and continued pursuit of
disciplinary action at the disciplinary hearing; (2) Cox's
decision to remove Russo from the Acting Chief Field
Representative position; and (3) Russo's non-selection for the
permanent position of Chief Field Representative.

### A.

"'To establish a First Amendment retaliation claim, a
public employee must show that (1) his speech is protected by
the First Amendment and (2) the speech was a substantial or
motivating factor in the alleged retaliatory action, which, if
both are proved, shifts the burden to the employer to prove that

_____

is claimed.'" *Jerri v. Harran*, 625 Fed. Appx. 574, 580 (3d Cir.
2015)(quoting *Johnson v. Lincoln Univ.*, 776 F.2d 443, 451 (3d
Cir. 1985)).

[5]   Plaintiff's brief uses "grievances" to refer to both union
grievance forms as well as the desk audit filed with the civil
service commission.  The Court's use of "grievances" includes
all three documents as well.

(3) the same action would have been taken even if the speech had not occurred.'" *Munroe v. Central Bucks School District,* 805 F.3d 454, 466 (3d Cir. 2015)(quoting *Garcetti v. Ceballos*, 547 U.S. 410, 986 (2006)).[6]


(1)  None of the speech at issue is protected by the First Amendment's Free Speech Clause

Speech is constitutionally protected only if: (a) "the employee . . . speak[s] as a citizen (and not as an employee)"; (b) "'the speech . . . involve[s] a matter of public concern'"; and (c) "the government lack[s] 'an adequate justification' for treating the employee different than the general public." *Munroe*, 805 F.3d at 466 (quoting *Garcetti*).

The Court holds that a reasonable factfinder could only conclude that Russo spoke as an employee and not a citizen in connection with the 1600 Arctic Avenue citation and the MLK property exemption.  Additionally, the Court holds that Russo's grievances did not involve a matter of public concern.

With regard to whether a plaintiff spoke as an employee, the Third Circuit has explained, "the 'controlling factor' is

---

[6]  The Court is compelled to observe that none of the papers submitted by either side in connection with the instant motion even cite *Garcetti*, much less apply its standard to the facts of this case.  The Third Circuit cases applying the *Garcetti* standard (extensively cited herein) are numerous and recent. Counsels' failure to cite and apply controlling Supreme Court precedent, as well as their failure to cite *any* Third Circuit decision issued later than 2008, is deeply disturbing.

whether the statements were 'made pursuant to the speaking employee's duties,' that is, 'whether such utterances were among the things that the employee 'was employed to do.'" *Flora, Jr. v. County of Luzerne,* 776 F.3d 169, 177 (3d Cir. 2015)(quoting *Garcetti*).

Conversely, "[t]he responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the speech at issue was 'outside the scope of his ordinary job responsibilities.'" *Id.* at 179 (quoting *Lane v. Franks,* 134 S.Ct. 2369, 2378 (2014)); *see also Dougherty v. School District of Philadelphia,* 772 F.3d 979, 990 (3d Cir. 2014)("*Lane* reinforces *Garcetti's* holding that a public employee may speak as a citizen even if his speech involves the subject matter of his employment. . . . 'the critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'")(quoting *Lane*).

"Whether speech is protected depends on the answers to several fact-intensive questions: what did a person say, in what form, in what context, what was the scope of his employment, and was the speech on a matter of public concern?" *Jerri v. Harran,* 625 Fed. App'x 574, 579 (3d Cir. 2015).

The record considered as a whole, and construed in the light most favorable to Russo, clearly demonstrates that with

15

regard to the 1600 Arctic Avenue citation and MLK property
exemption incidents, Russo spoke as an employee, not as a
private citizen.

Russo's involvement in the 1600 Artic Avenue citation was
very limited.  All of the record evidence is consistent on this
point: Russo merely stamped his approval of a citation issued by
an inspector he supervised.  He did so as Acting Chief Field
Representative, and approving citations was a routine action for
the Chief Field Representative-- so much so that approvals were
issued with a signature stamp.  Indeed, as to the citation of
1600 Artic Avenue specifically, Russo testified:

> Well, it was just a course of inspections done as
> any other day and this was just one of the
> violations that came through.  There might have been
> 20 or 30 of them done. . . . I saw that [1600 Artic
> Avenue] had a repair or demolish [citation], that
> looked fine, stamped it and that was it.  It didn't
> seem anything out of the ordinary.

(Russo Dep. p. 139)

John Stinsman, the inspector who issued the citation, also
testified as to the citation of 1600 Arctic Avenue:

> Q:  Can you tell me, is that Garry Alston's
> signature or Garry Alston's stamp?
>
> A:  Looks like a stamp to me.
>
> Q:  When you completed this form . . . what did you
> do with it?
>
> A:  I kept a copy for my records and then it was
> turned in, it was logged, and put in a notice of
> violation book.

(Stinsman Dep. p. 61)

Thus, a reasonable factfinder could only conclude that Russo was acting within the scope of his ordinary employment duties when he approved the citation of 1600 Artic Avenue. Therefore, the Court holds that Russo's speech is not protected by the First Amendment.

Likewise, a reasonable factfinder could only conclude that Russo was acting within the scope of his ordinary employment duties when he sought an opinion from the International Code Council concerning the exemption granted to the MLK property.

Russo testified, "I'm the contact for the City for the International Property Maintenance Code." (Russo Dep. p. 125) He also testified that he wrote the letter to the International Code Council, at the direction of his supervisor, Garry Alston. (Id. at p. 124-25)  Additionally, the letter inquiry was relatively narrow in scope, insofar as it sought an opinion in relation to one specific exemption given to one specific property, and was written solely for the purpose of "find[ing] out whether or not an exemption should be given." (Russo Dep. p. 126; Defs' Ex. G)

The Third Circuit has "held . . . that a claimant's speech might be considered part of his official duties if it relates to special knowledge or experience acquired through his job." *Gorum*

*v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009)(internal citation and quotation omitted).  A reasonable factfinder could only conclude on this record that Russo's special knowledge of, and experience with applying, the International Property Maintenance Code was acquired through his decades-long employment in the Atlantic City Licensing and Inspections Department, and more specifically, as the City's contact for the International Property Maintenance Code.

Moreover, the undisputed fact that Russo wrote the letter at the direction of his supervisor, while not dispositive, is one relevant factor further supporting the conclusion that Russo's speech was made pursuant to his duties as Supervising Field Representative, not as a private citizen.  *See Foraker v. Chaffinch*, 501 F.3d 231, 243 (3d Cir. 2007) *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011).

Thus, a reasonable factfinder could only conclude that Russo was acting within the scope of his ordinary employment duties when he wrote the letter to the International Code Council.  Therefore, the Court holds that Russo's speech as it relates to the MLK property exemption is not protected by the First Amendment.

Finally, the Court holds that Russo's grievances concerning Cox's two specific personnel decisions occurring within a

relatively short period of time within the Department of
Licensing and Inspections are not a matter of public concern.

"[I]nternal workplace matters and personal grievances . . .
clearly fall outside the sphere of First Amendment protection."
*Garcia v. Newtown Township,* 483 F. App'x 697, 703 (3d Cir.
2012). "'While the First Amendment invests public employees
with certain rights, it does not empower them to
constitutionalize the employee grievance.'" *Abernethy, Jr. v.
Mercer*, 532 F. App'x 160, 163 (3d Cir. 2013)(quoting *Garcetti*
and holding that "workplace complaints about the behavior of
[plaintiff's] supervisors" were not a matter of public
interest).

Nothing about Russo's grievances concerning solely his own
job placement "adds to the debate on matters of public
importance." *Borden v. School District of the Township of East
Brunswick,* 523 F.3d 153, 170 (3d Cir. 2008); *see also Montone v.
City of Jersey City,* 709 F.3d 181, 193 (3d Cir. 2013)("the key
to the 'public concern' inquiry is 'whether expression of the
kind at issue is of value to the process of self-
governance.'")(quoting *Azzaro v. County of Allegheny,* 110 F.3d
968, 977 (3d Cir. 1997)(en banc)).

The Court holds that Russo's grievances are not speech protected by the First Amendment because they do not involve an issue of public concern.[7]

### (2) Additionally, Plaintiff's evidence fails to support a finding that Russo's approval of the 1600 Arctic Avenue citation was a motivating factor in any of the asserted retaliatory actions

A factfinder could not reasonably infer on this record that Defendant Cox knew that Russo approved the citation of 1600 Arctic Avenue.  Russo's name appears nowhere on the citation; the document bears only Garry Alston's signature stamp.  (Defs' Ex. P)

Russo invites the Court to conclude that Cox must have known that Russo approved the specific citation for 1600 Artic Avenue from the solitary fact that Cox was Director of the

---

[7]  Plaintiff's complaint is clear: Plaintiff only asserts a claim for violation of his First Amendment free speech rights, not any First Amendment right to petition. *See* Compl., Count 1 ¶¶ 1-3. There being no claim for violation of Plaintiff's right to petition, the Court does not address the issue. *See Brennan v. Norton,* 350 F.3d 399, 417 (3d Cir. 2003) ("We reject Brennan's Petition Clause argument not because the district court required a showing of a 'public concern' analysis, but because Brennan never made a Petition Clause argument in the district court in the first place.  His only First Amendment claim there was based on the Speech and Association Clauses.  His complaint alleged: 'the defendants' acts and conduct described herein deprived plaintiff of his rights to free speech and free association under the First Amendment, including but not limited to the right to speak on matters of public concern, in violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983.' There was no reference to the Petition Clause.").

Department of Licensing and Inspections.  According to Russo,
Cox must have known whether or not his subordinates were in the
office on any given day.

Even assuming *arguendo* the reasonableness of that
particular inference however,[8] Russo's argument requires an
additional inference.  Not only would Cox need to know that
Alston was out on medical leave on the particular day the 1600
Artic Avenue citation was approved (March 1, 2012), he would
also have to know that Russo used Alston's signature stamp to
approve that particular citation.  There is absolutely no
evidence in the record to support that additional logical leap.
Contrary to Russo's argument, the memo from the City's Business
Administrator, requesting the names of everyone involved in the
citation for the purpose of voiding the Department's previous
actions (Defs' Ex. R) does not support such a conclusion.  The
memo directs that names be sent to the Business Administrator,
not Defendant Cox.  Defendant Cox was merely carbon copied on
the memo requesting the names. (Id.)

Cox testified that he did not know that Russo had any
involvement with the citation of 1600 Arctic Avenue (Cox Dep. p.
122), and there is no record evidence supporting an inference to
the contrary.  Accordingly, the record evidence fails to support

---

[8]  Cox's deposition testimony calls into question the
reasonableness of that inference, *see supra* at p. 4-5, but the
Court need not decide the issue.

a finding that Cox retaliated against Russo for approving the citation of 1600 Arctic Avenue.

(3)  Defendant Cox having committed no constitutional violation, Defendant City of Atlantic City has no § 1983 liability

Russo seeks to impose liability on the City of Atlantic City on the theory that Defendant Cox was a policymaker with regard to the alleged retaliatory actions that were taken.[9] However, absent an underlying constitutional deprivation, there can be no municipal liability.  *See Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) ("There cannot be an 'award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.'")(quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Accordingly, summary judgment will be granted to Defendant City of Atlantic City on the First Amendment retaliation claims.

**B.**

The Third Circuit has repeatedly stated, "'where the claim over which the district court has original jurisdiction is

---

[9]  The Court makes no ruling on whether Defendant Cox actually was, as a matter of law, a policymaker.  Notably, Russo testified that the "appointing authority," at least for the position of Chief Field Representative, was not Defendant Cox, but rather the Mayor of Atlantic City.  (Russo Dep. p. 245-47)

dismissed before trial, the district court *must* decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'"  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)(citing 28 U.S.C. § 1367(c)(3), and quoting *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995))(emphasis added); *cf. Sarpolis v. Tereshko*, 625 F. App'x 594, 600 (3d Cir. 2016)(affirming district court's retention and exercise of supplemental jurisdiction under § 1367(c)(3) because the district court had "an affirmative justification for exercising supplemental jurisdiction.")(quoting *Hedges*).

There appears to be no affirmative justification for retention of jurisdiction over the CEPA claims.  However, the Court will allow the parties an opportunity to show cause why the CEPA claims should not be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### c.

Lastly, Defendants' Answer purports to assert a "counterclaim," pursuant to 42 U.S.C. § 1988(b), for attorneys fees associated with the § 1983 claims.  The Court does not construe this asserted counterclaim as a separate federal claim for purposes of retaining or declining supplemental

jurisdiction.   Indeed, § 1988 expressly states that attorneys
fees may be "allow[ed]" "*as part of the costs*" within "any
action or . . .  to enforce a provision of section[] [1983],"
(emphasis added), thus suggesting that a request for attorneys
fees under the statute is not a separate cause of action, or at
least need not be brought as a separate claim or counterclaim.

In the event that the Court does decline to retain
supplemental jurisdiction over the state law claims, Defendants
may still file a *motion* for fees pursuant to § 1988.  *See Local
Union No. 1992 of IBEW v. Okonite Co.*, 358 F.3d 278, 287 (3d
Cir. 2004)("As the Supreme Court explained in *Budinich v. Becton
Dickinson & Co.*, [486 U.S. at 199, 202 (1988)] the pendency of a
motion for attorneys' fees does not preclude entry of a final
judgment. . . . As a result, it is often the case tha[t] an
order embodying a final judgment leaves open the assessment of
attorneys' fees.  Indeed, Rule 58 contemplates that 'entry of
the judgment shall not be delayed, nor the time for appeal
extended, in order to tax costs or award fees.' Fed. R. Civ. P.
58."); *see also White v. N.H. Dep't of Employment Sec.*, 455 U.S.
445, 452 (1982)(holding that a postjudgment motion for attorneys
fees under § 1988 should be construed as a motion for costs
rather than a motion to alter or amend the judgment).

Accordingly, unless the parties, in response to the order
to show cause, provide an adequate justification for exercising

supplemental jurisdiction over the CEPA claims, the disposition
of this suit will be the following: the Court will (1) enter
final judgment for Defendants on the First Amendment claims; (2)
dismiss without prejudice the CEPA claims; and (3) grant
Defendants leave to file a motion for attorneys fees pursuant to
§ 1988(b) within 60 days of the entry of final judgment.


**IV.  Conclusion**

For the above-stated reasons, Defendants' motion for
summary judgment will be granted as to all § 1983 claims.  As to
the remaining CEPA claims, the parties will be ordered to show
cause why those claims should not be dismissed without
prejudice.  An appropriate order accompanies this opinion.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated: April 14, 2016